Filed 12/15/21

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JOHN MUSERO, | B305066 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 19STCV10435) |
| v. | |
| CREATIVE ARTISTS AGENCY, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Yolanda Orozco, Judge. Affirmed.

Lewis Brisbois Bisgaard & Smith, Craig Holden; Ballard Spahr, Louis P. Petrich and Robert S. Gutierrez for Defendants and Appellants Creative Artists Agency, LLC, Andrew Miller and Leah Yerushalaim.

Doniger/Burroughs, Stephen M. Doniger and Kelsey M. Schulz for Plaintiff and Respondent.

_____

John Musero, a writer, sued his former talent agents, Andrew Miller, Leah Yerushalaim and Creative Artists Agency, LLC (CAA), for breach of fiduciary duty, breach of contract and breach of the implied covenant of good faith and fair dealing, alleging they had mishandled their representation of him in several different ways. Miller, Yerushalaim and CAA (collectively CAA parties) moved pursuant to Code of Civil Procedure section 425.16 (section 425.16) to strike allegations in the complaint, repeated in each of the three causes of action, accusing them of having misappropriated Musero's creative work, a proposed television pilot titled *Main Justice*, and using that material to assist in the development of a competing project, also titled *Main Justice*, with another CAA client. The trial court denied the motion, ruling, although the CAA parties' alleged conduct was protected speech activity that concerned a matter of public interest, Musero had demonstrated the requisite minimal merit of the claim.

Although we agree the challenged conduct arises from protected speech activity, when the context and content of the specific allegedly wrongful statements are considered, their degree of connection to a topic of public interest is insufficient to warrant protection under section 425.16, subdivision (e)(4). Accordingly, we affirm the order denying the CAA parties' special motion to strike.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Musero's Complaint*

Musero filed a complaint for breach of fiduciary duty and confidentiality, breach of contract and breach of the implied covenant of good faith and fair dealing on March 26, 2019, naming as defendants CAA, Miller and Yerushalaim. Musero, a

2

former prosecutor and in-house studio lawyer who had worked as a staff writer on the third season of Aaron Sorkin's HBO series *The Newsroom*, alleged that in mid-2014 Miller and Yerushalaim, members of CAA's literary department, agreed to represent him. He communicated to Miller and Yerushalaim his goals of working as a writer on another television series and supplementing that income by selling his original work in the form of television pitches and pilots.

Musero alleged the CAA parties mishandled his representation in a variety of ways, including not aggressively shopping a pilot script he prepared titled *Influence*, which he submitted to his agents in September 2014; failing to appropriately follow-up with potential buyers for a second pilot script he wrote titled *Main Justice*, a legal drama about the Attorney General of the United States and prosecutors working at the Department of Justice, which he submitted in September or October 2015; not assisting in the timely payment and collection of fees to which he was entitled for additional work in connection with an option agreement for *Main Justice* he entered with The Mark Gordon Company in April 2016; and not submitting Musero's name for staffing opportunities on another television series.

Musero further alleged that CAA and Miller represented producer Jerry Bruckheimer, his production company Jerry Bruckheimer TV and the writer Sascha Penn and that Miller initiated the development with Penn and Bruckheimer of a project also titled *Main Justice* that, like Musero's pilot, was centered on the Attorney General of the United States. The complaint continued, "Upon information and belief, Miller and Penn created a pitch document which was used to sell

Bruckheimer's *Main Justice* to CBS during the summer of 2017. That pitch document was preceded by, borrowed from, and harvested the concept, pitch, series overview and pilot created by Musero under the same title, *Main Justice*, each of which was shared with, and represented by, Miller." Although never ultimately broadcast, Musero alleged CBS approved production of the Bruckheimer pilot, which was "cast and produced for millions of dollars" and resulted in significant economic benefit to CAA. He additionally alleged that, by selling a competing project "under the same title about the same thing," Miller foreclosed any possibility of Musero's *Main Justice* being sold. (The Mark Gordon Company did not exercise its option to purchase Musero's project; the option expired in June 2017; and the rights reverted to Musero.) "In so doing, Defendants advantaged its more power[ful] client, Jerry Bruckheimer and Bruckheimer TV, at the significant expense of its less powerful client, Musero."

Musero's allegations the CAA parties misappropriated creative elements from his *Main Justice* project and used them to develop the Penn-Bruckheimer project are specifically realleged in each of the complaint's three causes of action.

2. *The CAA Parties' Special Motion To Strike*

On May 21, 2019 the CAA parties filed a special motion to strike the allegations in Musero's complaint that they had misappropriated his *Main Justice* pilot script and used his creative ideas to develop the Penn-Bruckheimer *Main Justice* project.[1] They cited case law holding the creation of a television

---

[1] Concurrently with their special motion to strike, the CAA parties demurred to the complaint. The trial court sustained the demurrer to Musero's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing with

4

program is constitutionally protected speech activity and argued, as widely disseminated expressive works, such programs are matters of public interest. They also explained the topics addressed in the Penn-Bruckheimer project involved real-world social and cultural issues.

As to the merits of Musero's claim of misappropriation, the CAA parties explained that ideas are not subject to common law or statutory copyright protection. Under *Desny v. Wilder* (1956) 46 Cal.2d 715, however, state law protection for ideas as property rights may exist if there was an express or implied-in-fact contract to pay for the disclosure of an idea: "'The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That

___

leave to amend and overruled the demurrer to the cause of action for breach of fiduciary duty. The court explained as to the contract claim, "While Plaintiff has alleged the general nature of Plaintiff's relationship with Defendants, the allegations as they stand do not indicate that Plaintiff 'clearly conditioned' his disclosure of the Main Justice script upon Defendants' agreement to pay for it if used. . . . Nothing indicates that Defendants' actions, communications, and history of representing [Musero] made it so that an implied in fact agreement was created wherein [Musero] clearly conditioned his disclosure of the Main Justice script upon Defendants' agreement to pay for it if used."

The trial court permitted Musero to file his first amended complaint prior to ruling on the special motion to strike. However, when considering the CAA parties' motion, the court ignored the allegations in the amended pleading, relying for this hybrid approach on dictum from *Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 677-678.

disclosure may therefore be consideration for a promise to pay . . . . Even though the idea disclosed may be "widely known and generally understood" [citation], it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty.'" (*Id.* at p. 733; see *Spinner v. American Broadcasting Companies, Inc.* (2013) 215 Cal.App.4th 172, 184 (*Spinner*) [*Desny* claim may be based on implied, as well as express, contract].) The CAA parties argued Musero could not provide any evidence his talent agents had agreed to pay for the use of his idea, an essential element of a *Desny* claim.[2]

Beyond that threshold issue, citing *Spinner*, *supra*, 215 Cal.App.4th 172 and *Hollywood Screentest of America, Inc. v. NBC Universal, Inc.* (2007) 151 Cal.App.4th 631, the CAA parties asserted Musero could not prove misappropriation. Although under established case law actual use may be inferred from evidence of access[3] and substantial similarity (*Spinner*, at p. 185;

---

[2] As noted, the trial court agreed with this argument in sustaining the CAA parties' demurrer (with leave to amend) to Musero's breach of contract cause of action.

[3] "Access means that the [writer of the allegedly offending work] had an opportunity to view or copy the plaintiffs' work. [Citation.] More than a '"bare possibility"' of access is required, however. [Citations.] When there is no direct evidence of access, the [writer] must have had a '"reasonable possibility"' to view the plaintiffs' work, which must be based on more than mere speculation." (*Spinner*, *supra*, 215 Cal.App.4th at p. 186.) The CAA parties argued under *Spinner*, when, as here, access allegedly occurred through an intermediary, "[a] reasonable possibility of access requires a sufficiently strong nexus between the intermediary to whom the plaintiffs submitted their work and the creator of the allegedly offending work. . . . In other words,

*Hollywood Screentest*, at p. 646), the CAA parties argued, "the defendants may dispel that inference with evidence that conclusively demonstrates the defendants independently created their product. [Citation.] When the defendants produce evidence of independent creation that is "'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved,'" the inference of use is dispelled as a matter of law." (*Spinner*, at p. 185.)

Relying on this authority, the CAA parties contended Musero could not prove Penn or others who may have contributed to the creation of his *Main Justice* pilot had access to Musero's *Main Justice* materials. To the contrary, the evidence conclusively established the Penn-Bruckheimer *Main Justice* pilot was independently created. Miller and Yerushalaim submitted declarations in support of the motion denying they had provided any of Musero's ideas, concepts or writings to Penn or had directed anyone else to do so. Miller also declared that Penn approached him with the idea for *Main Justice*; Miller did not initiate the idea.

    3. *Musero's Opposition and the Parties' Supplemental Papers*

After the CAA parties filed their motion, the trial court granted Musero's request to take limited discovery (the depositions of Miller and Penn and production of documents, including a copy of Penn's pilot script). Musero thereafter filed an opposition memorandum and supporting materials in which he argued there was substantial evidence that Penn had access to

---

the intermediary and the alleged copier occupy positions such that it is natural for one to impart information to the other." (*Id.* at pp. 186-187.)

7

Musero's script through Miller and there were overwhelming similarities between the two works.

As to access, Musero submitted evidence Miller had acted as Musero's agent in discussions regarding Musero's option agreement with The Mark Gordon Company in 2016; Miller and Penn in May 2017 discussed the idea of a show about the Attorney General; Miller was in regular communication with Penn from conception through pitch meetings at CBS; and CAA assisted Penn in writing the pilot by providing him a large volume of reference materials. Musero also provided the declaration of a former agent and entertainment industry executive who opined CAA had a significant financial incentive to market Penn's *Main Justice* rather than Musero's because of packaging fees that would be available on the Penn-Bruckheimer project. A different industry expert described similarities between the scripts for the two projects, both of which involved a newly appointed Attorney General (Musero's was a woman; Penn's was young and Black and based on former Attorney General Eric Holder, who participated in Penn's project); both included a car crash as an opening teaser scene followed by a basketball-related scene with a discussion regarding foul calls; and each ended with a cliff-hanger assassination attempt. He concluded there were "just too many unique story similarities" for the CAA parties to credibly claim the Penn-Bruckheimer *Main Justice* had been created independently of Musero's work.

The CAA parties filed a reply memorandum with additional evidence regarding the development of Penn's *Main Justice*. Following oral argument on the motion on October 1, 2019 and with the matter under submission, Musero filed an ex parte application to stay the court's ruling and allow further discovery.

8

The court granted the application; set a new hearing date; and allowed Musero to depose two CAA witnesses who had submitted declarations with the CAA parties' reply papers, to re-depose Miller regarding packaging deals and to propound another document request for correspondence CAA exchanged with Bruckheimer employees and Penn relating to *Main Justice*. The court also permitted the parties to file supplemental briefs.[4]

By the time the trial court held its second hearing on the CAA parties' motion, Musero had presented additional evidence that Miller and Penn had been personal friends for many years, not just business associates, and that CAA had a packaging fee arrangement with CBS Studies that would have (in Musero's characterization) effectively made CAA a partner with an independent equity interest in *Main Justice* had CBS picked up the Penn-Bruckheimer pilot as a series for network broadcast. In addition, Musero's evidence established that Miller had received drafts of Penn's pitch, outline and pilot script during their development and provided ongoing feedback to Penn regarding the project.

The CAA parties' evidence included Penn's and Miller's deposition testimony that Penn began working on an idea for a Department of Justice television series involving stories about hate crimes in 2004, more than 10 years before Musero submitted his *Main Justice* overview and pilot script to Miller and Yerushalaim. (Penn had written a treatment for his idea with the working title *Hate Crimes*.) In 2010 Penn, who was considering story ideas for a series with a female lead, suggested

---

[4] The trial court denied a subsequent request by Musero for yet more discovery.

9

several career possibilities for the character in an email to Miller, including having her be a newly appointed Attorney General. In 2016 Penn pitched his hate crimes idea, now titled *DOJ: Special Section*, to producers, and in August 2016 to NBC as *The Untitled Department of Justice Project*. One of the industry executives who reviewed the pitch advised Penn he needed to focus more on lawyers for a Department of Justice series. In a spring 2017 telephone call with Miller, Penn shared his idea for a series about the Attorney General and suggested they try to attach former Attorney General Holder to the project. By July 2017 Penn had met with Holder, who responded positively to the proposal. According to Penn, his pilot was built around Holder and the complexities of being a Black Attorney General: "That's what the show was about." "'[I]f Eric Holder didn't come on board, there was no show.'"

    4. *The Trial Court's Ruling Denying the Motion*

The trial court again heard argument on January 17, 2020, took the matter under submission and later denied the motion in a 23-page order.[5]

The court ruled the CAA parties had satisfied the first step of the two-step analysis for a special motion to strike under section 425.16, agreeing the alleged communications with Penn and Bruckheimer in connection with the creation, development and sale of the Penn-Bruckheimer *Main Justice* television project constituted protected speech or conduct in furtherance of protected speech and the production of *Main Justice* was a matter

---

[5]    The trial court ruled on the multiple evidentiary objections filed by the CAA parties, sustaining some and overruling others. Neither side challenges any of those rulings.

of public interest. "[T]he asserted public interest here is the 'general topic' of the Attorney General, and more specifically, Eric Holder. The Court finds that the topic itself is a matter of public interest, as the Attorney General, and Eric Holder are public figures regularly in the public eye. . . . Defendants participated in, or furthered, the discourse that makes the topic of the first [B]lack Attorney General, one of public interest by creating a show that was 'built around the notion of the complexities of being a [B]lack Attorney General' with story lines that can be said to be 'ripped [from] the headlines' of national news. Such a show would undeniably contribute to the public debate and discourse that makes the Attorney General and Eric Holder topics of public interest."

As to the second step of the analysis, the court ruled Musero had carried his burden of showing a reasonable probability of success on the merits. The court found Musero had presented evidence of access by Penn through Miller to Musero's *Main Justice* script or elements of it and substantial similarity between the two scripts sufficient to raise an inference of use. Although acknowledging the CAA parties had presented evidence that Penn's process in developing his script was entirely independent of Musero's ideas and work product, quoting *Spinner*, *supra*, 215 Cal.App.4th at pages 184 to185, the court concluded the evidence was not "'clear, positive, uncontradicted and of such nature that it cannot rationally be disbelieved'": "[G]iven Plaintiff's evidence that points to access and the substantial similarity between the two scripts, a reasonable jury could find that Penn's Main Justice was not independently created."

11

The CAA parties filed a timely notice of appeal. (Code Civ. Proc., §§ 425.16, subd. (i), 904.1, subd. (a)(13).)

**DISCUSSION**

1. *Governing Law and Standard of Review*

Section 425.16, commonly known as the anti-SLAPP statute, makes available a special motion to strike certain meritless claims early in the litigation: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1); see *Rand Resources, LLC. v. City of Carson* (2019) 6 Cal.5th 610, 619-620 ["[a] court may strike a cause of action only if the cause of action (1) arises from an act in furtherance of the right of petition or free speech 'in connection with a public issue,' and (2) the plaintiff has not established 'a probability' of prevailing on the claim"].)

Pursuant to section 425.16, subdivision (e), an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection

12

with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

In ruling on a special motion to strike under section 425.16, the trial court engages in a two-step process. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); accord, *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*); *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) To make its determination the court must consider the parties' pleadings and affidavits or declarations describing the facts on which liability or defenses are predicated. (§ 425.16, subd. (b)(2).)

As to the first step of the analysis, "[a] claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park, supra,* 2 Cal.5th at pp. 1062-1063.) Thus, "[t]he defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'" (*Wilson v. Cable News Network, Inc*. (2019) 7 Cal.5th 871, 884 (*Wilson*); see *Bonni, supra*, 11 Cal.5th at p. 1009 ["[t]he defendant's burden is to identify what acts each challenged claim rests on and to

13

show how those acts are protected under a statutorily defined category of protected activity"]; see *Park*, at p. 1060.)

A motion pursuant to section 425.16 need not challenge an entire cause of action as pleaded in the complaint. (*Bonni*, *supra*, 11 Cal.5th at p. 1010; *Baral*, *supra*, 1 Cal.5th at p. 382.) Rather, "courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni*, at p. 1010; accord, *Baral*, at p. 395.)

When, as here, the special motion to strike is based on section 425.16, subdivision (e)(4), "plaintiffs' causes of action must arise from defendants' conduct 'in connection with a public issue or an issue of public interest.'" (*Rand Resources, LLC v. City of Carson, supra*, 6 Cal.5th at p. 620; see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117-1118.) "In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity.'" (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145-146 (*FilmOn*).)

"As to the second step inquiry, a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" (*Sweetwater Union High School*

14

*Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940;[6] accord, *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) "'We have described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.'" (*Monster Energy*, at p. 788; see *Taus v. Loftus* (2007) 40 Cal.4th 683, 714 [the court should grant the section 425.16 motion "'if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim'"].)

---

[6] Although the Supreme Court in *Sweetwater Union High School Dist. v. Gilbane Building Co.*, *supra*, 6 Cal.5th 931 referred generally to "competent admissible evidence," the Court held evidence that is potentially admissible at trial, but not presented in admissible form, could be considered in determining whether the plaintiff had demonstrated a probability of success on the merits: "[A]t the second stage of an anti-SLAPP hearing, the court may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial. Conversely, if the evidence relied upon *cannot* be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility, the court may not consider it in the face of an objection. If an evidentiary objection is made, the plaintiff may attempt to cure the asserted defect or demonstrate the defect is curable." (*Id.* at p. 949.)

We review de novo an order granting or denying a special motion to strike under section 425.16. (*Wilson, supra,* 7 Cal.5th at p. 884; *Park, supra,* 2 Cal.5th at p. 1067.)

2. *The Challenged Conduct Is in Furtherance of Protected Speech Activity*

Creating a television show is an exercise of constitutionally protected expression. (*Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1521; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143; see *De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 860 [the First Amendment "'safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies, or plays'"].) Steps taken to advance such constitutionally protected expression are properly considered "conduct in furtherance of" the exercise of the right of free speech within the meaning of section 425.16, subdivision (e)(4). (See *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1039-1040 ["defendants' hiring and use of a cinematographer to obtain on-location footage and their maintaining an online journal of refugees' stories to gather ideas for the production are reasonably viewed as conduct 'in furtherance' of the documentary"]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 [newsgathering is conduct in furtherance of the news media's exercise of their right of free speech]; see also *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106 [musician's selection of supporting band members is conduct preliminary to, and in furtherance of, protected activity of performing or recording music]; *Hunter*, at

16

p. 1522 [selection of weather anchor is conduct in furtherance of protected activity of reporting the weather].)

The alleged wrong acts underlying Musero's misappropriation claim, challenged by the CAA parties in their special motion to strike, fall squarely within this category of conduct in furtherance of protected expression. As discussed, Musero alleged that Miller and Penn "created a pitch document which was used to sell Bruckheimer's *Main Justice* to CBS during the summer of 2017. That pitch document was preceded by, borrowed from, and harvested the concept, pitch, series overview and pilot created by Musero." A claim of misappropriation is central to each of the three causes of action in Musero's complaint. He alleged in paragraph 63, part of his first cause of action, "Defendants breached their fiduciary duties to Plaintiff by, *inter alia*, [¶] . . . [¶] (f) misappropriating Plaintiff's original and creative work in *Main Justice*, developing it with producer Jerry Bruckheimer, production company Bruckheimer TV and writer Penn, selling it to, and getting it made at CBS, thereby conferring a significant economic benefit to CAA, Miller and Yerushalaim." An identical subparagraph is alleged as one of the seven bases for his cause of action for breach of the implied covenant of good faith and fair dealing and in slightly truncated form as a basis for his breach of contract cause of action.

Musero disputes his lawsuit, or any claim within it, arises from conduct in furtherance of the right to free speech, asserting "the gravamen of Musero's complaint is his agents' breaches of their contract and fiduciary duties which resulted in Musero's work being used to make that show [the Penn-Bruckheimer *Main Justice*] without compensation or credit to him." By relying on the now-disfavored gravamen test to determine whether the anti-

17

SLAPP statute applies, Musero mistakes the proper first-step analysis. (See *Bonni*, *supra*, 11 Cal.5th at p. 1011 ["[t]he attempt to reduce a multifaceted cause of action into a singular 'essence' would predictably yield overinclusive and underinclusive results that would impair significant legislative policies"]; *Baral*, *supra*, 1 Cal.5th at pp. 393, 396 ["courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity"; as long as a "court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached" with respect to these claims].)

Musero alleged Miller and CAA actively assisted in the development of the Penn-Bruckheimer *Main Justice* project by misappropriating his original material. Although each of his three causes of action is also supported by allegations of nonprotected activity, that claim of misappropriation—that Musero's creative ideas were improperly conveyed to Penn as part of, or preliminary to, the creation of a television program— supplies an element of all three causes of action, regardless of what the *Bonni* Court referred to as the metaphysical essence of those causes of action. (See *Bonni*, *supra*, 11 Cal.5th at p. 1011.)

The Ninth Circuit's decision in *Jordan-Benel v. Universal City Studios, Inc.* (9th Cir. 2017) 859 F.3d 1184, on which Musero primarily relies, does not support a different result. The plaintiff in that case, a writer, sued a talent agency, one of its writer clients, a film production company and a motion picture studio for copyright infringement and breach of an implied contract, alleging they had stolen his idea for a screenplay and used it to make two successful motion pictures. The state law contract claim alleged the defendants had failed to compensate plaintiff

18

for the use of his idea (*id.* at p. 1186)—a *Desny* idea theft claim. The district court denied the defendants' special motion to strike the implied-in-fact contract claim, ruling the claim was based on the defendants' failure to pay, not their creation, production or distribution of the motion pictures. (*Ibid.*) The court of appeals affirmed, agreeing with the district court "the conduct or act underlying [plaintiff's] breach of implied-in-fact contract claim is Defendants' failure to pay for the use of the screenplay idea. This conclusion is compelled by the fact that the failure to pay was the specific act of wrongdoing alleged by [plaintiff] to give rise to a legal claim. . . . Because the 'overall thrust of the complaint' challenges Defendants' failure to pay for the use of his idea, we hold that the failure to pay is the conduct from which the claim arises." (*Id.* at p. 1191.)

Rejecting the argument the plaintiff would have no claim for payment but for the defendants' production and release of the films and, therefore, his claim necessarily arose from that expressive activity, the Ninth Circuit explained, "Because the target of [the plaintiff's] claim is not actually the expressive works (*The Purge* films), applying a 'but for' analysis in this case would threaten to subject plaintiffs to the burden and expense of litigating anti-SLAPP motions in cases where protected free speech activity is not the focus of the claim." (*Jordan-Benel v. Universal City Studios, Inc.*, *supra*, 859 F.3d at p. 1192.) "The California courts," the Ninth Circuit continued, "have said nothing to suggest that the State intended its anti-SLAPP law to apply when protected activity is not the target of a claim." (*Id.* at p. 1193.)

We need not parse the difference between a *Desny* claim challenging the failure to pay for an idea, as in *Jordan-Benel*, and

19

a claim alleging liability for the actual use of the idea, as here—a distinction the CAA parties urge us to make—to decline to apply the Ninth Circuit's reasoning.  As the quoted language makes clear, the Ninth Circuit's *Jordan-Benel* opinion, like Musero's argument in this court, is based on a pre-*Baral* "principal thrust or gravamen" approach to determining whether an entire cause of action arises from protected activity, and is inconsistent with *Baral*, as well as the Supreme Court's recent reiteration of the proper first step analysis in *Bonni*, *supra*, 11 Cal.5th 995.[7]  As *Bonni* and *Baral* instruct, whatever the purported "target" of a cause of action, if protected speech activity supplies an element of the claim, the burden shifts to the plaintiff to demonstrate a reasonable probability of prevailing on the merits.  Unquestionably in the case at bar, Miller's alleged participation in the creation and development of Penn's version of *Main Justice*, protected activity, is "not just evidence of liability or a step leading to some different act for which liability is asserted" (*Park*, *supra*, 2 Cal.5th at p. 1060), but provides an element of Musero's breach of fiduciary duty and breach of contract causes of action.

---

[7]  In a footnote the Ninth Circuit recognized the Supreme Court in its then-recent decision in *Baral*, *supra*, 1 Cal.5th 376 "explained that an anti-SLAPP motion may strike distinct claims within a cause of action, even if the entire cause of action is not subject to anti-SLAPP."  Although the court did not explain why it failed to apply the *Baral* analysis, it advised the district court to be aware of *Baral* "[s]hould the district court re-visit anti-SLAPP on remand."  (*Jordan-Benel v. Universal City Studios, Inc.*, *supra*, 859 F.3d at p. 1189, fn. 4.)

Musero's additional argument that section 425.16 does not apply because his complaint was filed after CBS elected not to pursue the proposed *Main Justice* series and the *Main Justice* pilot was never broadcast is equally flawed.  It has been clear for nearly two decades that a defendant moving under section 425.16 need not demonstrate the challenged claim was brought with the intent of chilling his or her exercise of constitutionally protected speech (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 58) or prove the cause of action complained of has had, or will have, the actual effect of chilling the defendant's exercise of speech or petition rights.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75.)  That Musero's lawsuit was filed after the expressive activity in this case, therefore, is immaterial.

Nor is it significant in determining whether an element of the misappropriation claim is conduct in furtherance of constitutionally protected speech that the creative efforts in this case did not result in a public airing of the Penn-Bruckheimer pilot:  "[C]onduct can assist and help to advance the exercise of the right of free speech, even if that assistance did not result in a completed exercise of free speech at the time the lawsuit is filed." (*Ojjeh v. Brown*, *supra*, 43 Cal.App.5th at p. 1042; see *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 106 [lawsuit that sought to void contracts between radio station and investigative organization that shaped the way news would be gathered and reported arose from protected activity].)

3. *The Challenged Conduct Does Not Concern an Issue of Public Interest*

As the Supreme Court instructed in *FilmOn*, *supra*, 7 Cal.5th at pages 144 to 145, "In protecting '*any* other conduct'

that meets the requirements laid out in its text (§ 425.16, subd. (e)(4), italics added), subdivision (e)(4) proves both broader in scope than the other subdivisions, and less firmly anchored to any particular context. [Citations.] This provision consequently suggests that courts should engage in a relatively careful analysis of whether a particular statement falls within the ambit of 'other conduct' encompassed by subdivision (e)(4)." More specifically, "within the framework of section 425.16, subdivision (e)(4), a court must consider the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest." (*Id.* at p. 149; accord, *Serova v. Sony Music Entertainment* (2020) 44 Cal.App.5th 103, 117, review granted Apr. 22, 2020, S260736.)

The *FilmOn* Court explained the appropriate analysis for determining whether challenged speech has a sufficient connection to a public issue to warrant anti-SLAPP protection. "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn, supra*, 7 Cal.5th at pp. 149-150.) Context includes the identity of the speaker, the audience and the purpose of the speech. (*Id.* at pp. 142-143, 145.) As our colleagues in Division Eight of this court held in *Jeppson v. Ley* (2020) 44 Cal.App.5th 845, under *FilmOn*, connecting a broad and amorphous public interest to a specific dispute is not enough. "The proper focus of the inquiry instead must be on 'the specific nature of the speech,' not on

22

'generalities that might be abstracted from it.'" (*Jeppson*, at p. 856; see *FilmOn*, at p. 152 ["[d]efendants cannot merely offer a 'synecdoche theory' of public interest, defining their narrow dispute by its slight reference to the broader public issue"]; *Rand Resources, LLC v. City of Carson*, *supra*, 6 Cal.5th at p. 625 ["[a]t a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance"].)

As discussed, the trial court, applying *FilmOn*, found the creation and production of the Penn-Bruckheimer *Main Justice* pilot was a matter of public interest, reasoning that the Attorney General and, more specifically, Eric Holder are public figures regularly in the public eye and that the CAA parties "participated in, or furthered, the discourse that makes the topic of the first [B]lack Attorney General, one of public interest." "Such a show," the court concluded, "would undeniably contribute to the public debate and discourse that makes the Attorney General and Eric Holder topics of public interest." The CAA parties echo this argument on appeal, contending there is a direct and close connection between the creation and production of *Main Justice* and the public interest topic of the Attorney General.

It is undoubtedly correct that a proposed television series not only based on the life of former Attorney General Holder but also apparently created in part by him would be a topic of widespread public interest. (See *FilmOn*, *supra*, 7 Cal.5th at p. 145 [a public issue is generally implicated if the subject of the statement or activity was a person or entity in the public eye]; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1254 [same].) But when the context and content of the specific, allegedly wrongful statements at issue here are considered, the degree of connection between those statements and that topic of public

interest is insufficient to warrant protection under section 425.16, subdivision (e)(4), as construed in *FilmOn*.

As to context, the alleged misappropriation of Musero's ideas was done privately and, according to Musero's theory, from Miller to Penn during the many telephone conversations that took place between them while Penn was developing *Main Justice*. Although communications between private individuals may qualify as protected activity in some circumstances (see *FilmOn, supra*, 7 Cal.5th at p. 146; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 91), the private nature of the communications "makes heavier [a defendant's] burden of showing that, notwithstanding the private context, the alleged statements nevertheless contributed to discussion or resolution of a public issue for purposes of subdivision (e)(4)." (*Wilson, supra*, 7 Cal.5th at p. 903; see *FilmOn*, at pp. 146, 150-151.)

As to content, significantly, Musero's creative work that Miller allegedly misappropriated and conveyed to Penn did not relate in any way to Eric Holder or to the first Black Attorney General of the United States; Musero's pilot script protagonist was an entirely fictional female Attorney General. Communicating the general idea of a legal drama (a "procedural," in television industry parlance) involving the Attorney General and prosecutors in the Department of Justice is not significantly different from the second 30 minutes of each episode of the *Law & Order* franchise that ran on NBC for 20 years, which focused on the Manhattan District Attorney's Office and its prosecutors, and is not closely linked to any ongoing public interest that might exist with respect to former Attorney General Holder or even to the Penn-Bruckheimer series itself. Indeed, the CAA parties essentially make that very point, albeit for an entirely different

24

reason, arguing the two projects are not substantially similar because the "defining element of Penn's script" was that it was "built around the complexities of being a [Black] Attorney General." As the CAA parties emphasize in their reply brief, "[T]he undeniable fact remains that Musero's MAIN JUSTICE lacks the defining focus of Penn's script, which is inspired and influenced by the creative input of Eric Holder himself. Musero also cannot change the fact that the Attorney General in his work was a female."

The other creative elements allegedly misappropriated by Miller and CAA for Penn's benefit are even further removed from any public interest in the professional and personal life of former Attorney General Holder or, indeed, any nonfictional individual who actually held the office. The title of the two pilots, *Main Justice*, for example, is simply the frequently used nickname for the Department of Justice's headquarters in Washington, D.C. (as well as the title of a book published in 1996 concerning the Department's criminal division and one of the six episodes of *The Newsroom* on which Musero worked as a staff writer). Car crashes, assassination attempts, cliffhanger endings and analogies—direct or subtle—between the justice system and the rules of basketball, whatever they may indicate about the similarity between the two pilot scripts, contribute nothing to the discussion of the issue of public interest identified by the CAA parties or the trial court.

In sum, the creative aspects of his work that Musero claims Miller misappropriated, privately communicated to a targeted audience of one, whatever its purported impact on Penn's work, did not contribute to the public conversation about a matter of public interest. (See *Rand Resources, LLC v. City of Carson*,

25

*supra*, 6 Cal.5th at p. 625 ["we reject the proposition that any connection at all—however fleeting or tangential—between the challenged conduct and an issue of public interest would suffice to satisfy the requirements of section 425.16, subdivision (e)(4)"; "[w]hat a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern"].)  The public interest requirement of section 425.16, subdivision (e)(4), has not been met.[8]

---

[8] At oral argument the CAA parties, quoting the statement in *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042 that an issue of public interest "is any issue in which the public is interested" (italics omitted), expanded their argument and asserted, because of television's broad appeal, any statement regarding television programming is in the public interest within the meaning of subdivision (e)(4).  *Nygard'*s sweeping pronouncement, made 11 years before *FilmOn*, is at odds with the Supreme Court's caution that determining whether the subject of speech or other conduct constitutes a matter of public interest requires an evaluation of specific contextual considerations, such as whether a person or entity was in the public eye or whether the activity occurred in the context of an ongoing controversy, dispute or discussion.  (*FilmOn*, *supra*, 7 Cal.5th at p. 145; see, e.g., *Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 22 [""[p]ublic interest" does not equate with mere curiosity'"]; *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1226 ["[n]o authority supports the [defendant's] broad proposition that anything said or written about a public figure or limited public figure in a public forum involves a public issue"]; see also *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807 [finding comments on an on-air radio broadcast were in the public interest because they concerned "a television show [*Who*

Because the CAA parties did not carry their threshold burden under section 425.16, we need not consider whether Musero demonstrated a probability of prevailing on the merits of any of his claims based on allegations of the misappropriation of his work.  (See *City of Cotati v. Cashman*, *supra*, 29 Cal.4th at pp. 80-81; *Shahbazian v. City of Rancho Palos Verdes* (2017) 17 Cal.App.5th 823, 830.)

## DISPOSITION

The January 17, 2020 order denying the CAA parties' special motion to strike is affirmed.  Musero is to recover his costs on appeal.


                                            PERLUSS, P. J.

We concur:



FEUER, J.



IBARRA, J.[*]

---

*Wants to Marry a Multimillionaire*] of significant interest to the public and the media"].)  As discussed, Miller's private conversations with Penn in which Miller allegedly communicated Musero's ideas for a legal drama centered on the Attorney General is only tangentially connected to any topic that can properly be considered to be of public interest.

[*]    Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.